IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| FRANK HARRIS, | ) Civil Action No. 3:04-2277-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BLUE CROSS AND BLUE SHIELD | ) **REPORT AND RECOMMENDATION** |
| OF SOUTH CAROLINA and | ) |
| COMPANION TECHNOLOGIES | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Frank Harris ("Harris"), brought this action against former employers, Blue Cross and Blue Shield of South Carolina ("BCBS"), and its wholly owned subsidiary, Companion Technologies Corporation ("CTC"). Harris alleges race and gender discrimination in defendants' failure to retain him during a reduction-in-force )("RIF") and his eventual termination in violation of Title VII.[1]  He also alleges a pendent state claim that his termination violated the public policy of South Carolina.  This case was automatically referred to the undersigned for pre-trial matters pursuant to 28 U.S.C. § 636 and Local Rule 73.02(B)(2)(g).[2]

---

[1] By stipulation, Harris' Age Discrimination in Employment Act was dismissed on September 13, 2005.

[2] Because defendants have filed a dispositive motion, this Report and Recommendation is entered for the Court's consideration. One of plaintiff's attorneys has requested a stay in all cases in which he is involved for medical reasons. Since the complaint in this action was filed by plaintiff's other attorney who remains of record, this case is not stayed. The parties shall file objections to this Report and Recommendation, if any, in the time prescribed in 28 U.S.C. § 636(b)(1).

Defendants filed a motion for summary judgment on October 17, 2005. Harris filed an opposition memorandum on November 15, 2005. Defendants filed a reply on November 23, 2005.

**Standard for Summary Judgment**

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there

is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

**Facts**

1. BCBS is a South Carolina corporation which provides medical insurance to policy holders in South Carolina and throughout the United States.

2. CTC is a South Carolina corporation, and a wholly owned subsidiary of BCBS. CTC sells technology products to physicians and hospitals including practice management software, electronic medical records software, electronic data interchange software and services, and internet-based health care claims submission products and services. (Harris. Aff., ¶¶ 1 and 2).

3. BCBS is the largest health insurer in South Carolina. Harris explains the interrelationship of BCBS and CTC and their market approach:

> It was a decided advantage being affiliated with the largest health insurer in South Carolina. The strategy of Companion Technologies was to utilize the leverage BCBSSC had gained by controlling such significant portions of Hospitals' and Physicians' revenue into lowering the in-house cost associated with manual claims processing. It was and is significant that in more instances than not, BCBSSC provided well over half of the payments hospitals and physicians were receiving. It is of note, that BCBSSC with its private business and the Federal Employees Program, Medicaid, Medicare, CHAMPUS, the contract for the State Employees of South Carolina, the financial impact to hospitals and physicians could easily approach numbers such as 80-95% of total revenue. CTC was assigned to secure the claims submitted by the providers of service electronically, lowering the cost of manual claim processing and thereby making the company more competitive in its biding process to secure more business. Access to the potential customers was greatly enhanced because of the influence BCBSSC had on these providers' accounts receivable.

(Harris Aff., ¶ 8).

4. Harris began working for BCBS in 1976. After an assignment in the Washington, D.C. area, Harris returned to South Carolina and began working for the predecessor of CTC. (Harris Aff., ¶¶ 2 and 7).

5. In 1999, CTC began Companion Direct ("CD"), a secret, revolutionary endeavor which was to utilize the internet for electronic data interchange ("EDI") as it related to the health care industry. (Harris Aff., ¶ 13). The concept involved:

> CD was envisioned as a load-and-go software/portal that would allow a physician's office to quickly sign up on the web for service. Unlike competing systems CD would work with any practice management system with no programming necessary from any other vendor. CD would use data mining to extract demographic and clinical information necessary to create an electronic claim from a PM system. CD would then format that data into the designated payer's specifications and transmit the claim directly from the physician's desktop to the payer. CD would allow for real time electronic checks of eligibilities from participating payers. One of the advantages of CD was that since the transaction was from provider to payer that it bypassed the need for HIPAA compliant transactions, which was a huge deal in 1999.

4

> There was no start up cost and the cost per transaction was one-third of what the traditional clearinghouses (including CTC) were charging.

(Hartis Aff., ¶ 4).

6. Bob Higgins was Executive Vice President and CEO of CTC.

7. Dale Hartis became "executive sponsor" of CD and as such, managed "the day-to-day operation of the entire [CD] staff and project." (Hartis Aff., ¶¶ 4 and 5).

8. Harris and Betty Comer ("Comer") at the time were CTC employees and became early members of the CD project. (Harris Aff. ¶ 11, Hartis Aff., ¶¶ 6 and 7).

9. CD began with a design and development program followed shortly (from early 2000) by a sales and marketing stage. (Hartis Aff., ¶ 9).

10. CD developed a "push and pull" sales strategy. The "push" strategy was to sell directly to end-users. The "pull" strategy was "to use channel partners (individuals or entities in healthcare who dealt with the same providers [CD] was targeting as potential customers to 'pull' CD to providers through some sort of revenue sharing or other value proposition." (Hartis Aff., ¶ 9).

11. Beginning in late 2000, CD hired:

   1. Jackie Meade Brennan ("Meade"), a marketer of direct, i.e., push, sales (Harris Aff. ¶ 14, Hartis Aff. ¶ 12);

   2. Sharon Roseberry ("Roseberry"), push sales (Harris Aff. ¶ 12, Hartis Aff.¶ 13); and

   3. Laura Ross ("Ross"), pull sales (Harris Aff. ¶ 17, Hartis Aff. ¶ 13).

12. Later CD hires included:

   1. Jed Shropshire ("Shropshire"), contact sales consultant (Hartis Aff. ¶ 18);

   2. April Tucker ("Tucker"), Marketing Service Specialist (Hartis Aff. ¶ 19); and

       3.      John Evans ("Evans"), pull sales (Hartis Aff. ¶ 21).

13. In the Spring of 2002, it became apparent that the system being developed by CD would not be technically and economically feasible. CD continued development and sales efforts but began to cut back and refocus. Shropshire's contract was cancelled and Roseberry was not replaced when she resigned (Hartis' Dep. ¶ 23);

14. Harvey Galloway ("Galloway") became CTC's Executive Vice President and CEO in the summer of 2002. (Harris Aff. ¶ 29; Hartis Aff. ¶ 24).\

15. Galloway directed Hartis to develop an exit strategy for CD shifting its operations to CTC. (Hartis Aff. ¶ 24; Galloway Dep. 75-76).

16. Hartis began to change his focus to retaining CTC market generated through business with South Carolina hospitals. (Hartis Aff., ¶ 25).

17. In September of 2002, Galloway directed Hartis to propose budget cuts for the CD sales and marketing program. (Hartis Aff., ¶ 26). Hartis developed a plan "to keep one sales person as the point of contact to our existing CD provider customers only, and who could also direct sell our hospital EDI products." (Id.).

18. The plan developed included attrition (Comer), transfer (Tucker), elimination (Evans, Harris and Ross), and retention of Meade in the remaining sales position. (Hartis Aff., ¶ 27).

19. Evans was notified in October of 2002 that his position was being eliminated. (Id.).

20. In November of 2002, Hartis announced at a CD staff meeting that a RIF would occur. (Harris Aff., ¶ 26; Hartis Reply Aff. ¶ 18; Ross Aff. ¶ 5).

21. Hartis presented Galloway with a proposed RIF plan for the CD marketing group. It stated:

Reduction in Force Plan
Companion Direct Marketing Group

Draft Proposal

In an effort to reduce the cost associated with marketing/sales of the Companion Direct products by Companion Technologies the following proposal is offered.

| | |
|---|---:|
| John Evans position has been eliminated effective 11/22/02. Annual savings | $51,000 |
| Betty Comer will retire at the end of year and her position eliminated | $57,216 |
| April Tucker will be split between CT marketing and technical area | $15,050 |
| Laura Ross's position will be eliminated. | $77,500 |
| Frank Harris position will be eliminated. | $83,224 |

Total reduction in annual salary will be $283,990. This is base salary and does not include benefits or other cost allocations.

There are some issues not resolved at this time. I am meeting with Jasmine Lang of HR on Friday morning to get their approval of the total RIF process. This could mean some changes to the above projections. Due to tenure issues (and other) we may have to retain Frank Harris or add Jacki Meade to the RIF.

I will also seek HR's guidance regarding timing, length of notifications, and or personnel issues.

This is my proposal and while I hate to let any of these people go due to current circumstance it is what I would recommend.

(Hartis Dep., 49-50 and Ex. 7(3); Galloway Dep. 57).

22. Galloway approved the proposal after discussion with Barbara Kelly, Vice President of Human Resources for BCBS. (Galloway Aff. ¶¶ 2, 3, 4; Hartis Dep. 54-58).

23. On December 4, 2002, Hartis and Jasmine Lang Elliott (Elliott), a BCBS HR Generalist assigned to CTC (Kelly Dep., Ex. C), met with Harris (and Ross) and officially advised him of the elimination of his position (Harris Aff. ¶¶ 27 and 29; Hartis Dep. 73 and Ex. 7)(4)).

Elliott was there to assist Harris "in finding another position within the company before January 31st." (2003). (Hartis Dep. Ex. 7(4)).

24. On January 8, 2003, Galloway and Kelly notified a large group of CD employees that their positions were eliminated due to the RIF. (Galloway Dep. 42-43 and Ex. 10, Aff. ¶ 3, and Harris Dep. 163-64).

25. In January of 2003, Harris applied for a position as Customer Consumer Advocate. Cathy Huddle ("Huddle); Vice President of Operations for CTC, selected a white female, Karen Hardy ("Hardy") for the position. (Huddle Dep. 13; Harris Aff. ¶¶ 38-57).

26. Kelly contacted Harris and advised him that he could apply for a management position in the Mail Room. Harris declined to apply for this position or any other positions with BCBS. (Harris Dep. 154-55, 170; Harris Aff. ¶ 33.)

27. Harris' termination became effective on January 31, 2003 (Harris Aff. ¶ 2).

## **Discussion**

A.   Title VII

Harris asserts that his termination and CTC's failure to hire him for the Customer Consumer Advocate position were due to his race and gender in violation of Title VII. Thus, Harris alleges disparate treatment due to his race and gender. He must show that "but for" defendants' motive to discriminate he would not have been terminated and that he would have been hired as Customer Consumer Advocate. He can show this (1) by offering sufficiently probative direct or indirect evidence of the issue under the ordinary standards of proof; or (2) by establishing a prima facie case under a judicially sanctioned scheme pursuant to McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).

    1.  Direct Evidence

    When "a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a [McDonnell Douglas] prima facie case." Swierkiewicz v. Sorema, NA, 534 U.S. 506, 511 (2002).  In the Title VII context, the Fourth Circuit defines direct evidence as evidence that the employer "announced, admitted, or indicated that [the forbidden consideration] was a determining factor" in its employment decision. Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), cert. denied, 454 U.S. 860 (1981).  In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (evidentiary standard for mixed-motive jury instruction).

 Harris argues that he has presented sufficient direct evidence of defendants' intent to discriminate to preclude summary judgment (Pl. Mem., 20-21).  The undersigned disagrees.  Harris' argument revolves around the draft proposal Hartis prepared for Galloway (Hartis Dep., Ex. 7(3)) which is quoted above.  This document proposes the elimination of Harris' position, but not that of Meade.  It states that Hartis would meet with Lang (i.e., Elliott) to obtain HR's "approval of the total RIF process" and that changes may have to be made and that "(d)ue to tenure issues (and other) we may have to retain Frank Harris or add Jackie Meade to the RIF."  Harris then cites several portions of the record[3] and argues that "(a) reasonable inference derived from this compelling evidence is that

---

[3]These include the testimony of Hartis and Elliott concerning the RIF and the memorandum. Harris stretches the interpretation of the testimony.  For instance, Harris argues that "Davis told
(continued...)

9

Hartis' proposal was in fact rejected because it would violate Title VII. Hartis and Galloway, it can be inferred, moved forward with the plan anyway and discriminated against Harris in the process." (Pl. Mem., 21). This argument is self-defeating since it relies not on direct evidence, but on multiple inferences.

        2.        Prima Facie Case - RIF

The parties agree that Harris can establish a prima facie case by showing that: (1) he was within a protected class; (2) he suffered an adverse employment action; (3) he was qualified to assume another position at the time of his discharge; and (4) defendants did not treat race or gender neutrally, but instead discriminated based upon race and gender. Corti v. Storage Tech. Corp., 304 F.3d 336, 341, n.6 (4th Cir. 2002). Defendants concede that Harris can establish the first two elements of the prima facie case, but that he cannot establish the last two elements.

It is undisputed that the RIF was implemented due to the failure of CTC to successfully develop and market CD. Harris does not contend that the RIF was a subterfuge to discriminate against him. Further, the RIF was conducted in two stages. First, the RIF for Harris and the marketing department was implemented. Then, the larger RIF for the entire research and development area of CD took place. It is implementation of the RIF as it affected the marketing group which is at issue in this case.

---

$^3$(...continued)
Hartis that Harris' tenure could only be overridden for 'compelling reasons.'" (Pl. Mem., 21). Actually Hartis testified that he was told by Davis that "if there were compelling reasons otherwise, tenure would not be an overriding factor." (Hartis Dep., 44). Anthony Davis ("Davis"), a black male, was an HR generalist assigned to CTC who was transferred shortly before the RIF and replaced by Elliott.

Defendants do not directly address the last two elements of the prima facie case stated above, but argue: (1) the RIF applied to the six members of the marketing group was "race and gender neutral on its face; (2) Harris cannot show that the decision maker (Hartis) discriminated because he and Harris were friends and any preference Hartis gave to Meade because of a romantic relationship[4] between then does not support the allegation of discrimination; (3) Meade was more qualified for Harris than the position which evolved from the RIF; and (4) there is no evidence that Galloway was motivated by discriminatory intent." (Def. Mem., pp. 13-17).

          a.        Qualified for Other Positions

The third element of the prima facie case stated above required Harris to show that he was qualified to assume another position with defendants at the time of his termination. As noted above, defendants make no specific argument on this issue.

There is not a case where a RIF was used to reduce the number of employees and the selection was based on past performance. Thus, in this instance relative performance does not relate to qualification for retention or for moving an employee to a new position. It can hardly be argued in the context of establishing a prima facie case that Harris was unqualified. In his twenty-six year career there is no suggestion that his work was unacceptable or that he had ever been disciplined. Defendants encouraged him to apply for other management positions. Hartis wrote a glowing letter of recommendation for Harris. The record fully supports a conclusion that Harris was qualified for retention in some capacity.

---

[4] A theme that runs throughout defendants' argument is that Hartis hired and retained Meade because they were romantically involved. Although denied by Hartis and Meade, the assertion is supported by Harris' deposition testimony. (Harris Dep. 37-48).

>   b.   Race and Gender Neutrality

To establish the fourth element of his prima facie case, Harris must show that defendants did not treat race or gender neutrally. Harris has established this element because he has shown that a white female was retained as he was terminated. "The fourth element [in a RIF case] can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race [and gender]." Juarez v. ACS Gov't. Solutions Group, Inc., 314 F.3d 1243, 1246 (10th Cir. 2003).

> 3.   Pretext - RIF

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer proffers the required non-discriminatory reason for its action, the plaintiff must then show that the reason stated by the employer was not the true reason for its action, but was a pretext for discrimination. Id. at 804; Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

In articulating a legitimate, non-discriminatory reason for terminating Harris while retaining Meade, defendants state that "Hartis's recommendations, and Harvey Galloway's acceptance of them, constitute 'an exercise of managerial discretion [that] is entirely legitimate' under the discrimination laws," Defendant's Motion for Summary Judgment, citing Merish v. Walker, 359 F.3d 330, 332 (4th Cir. 2004). Hartis summarized his recommendation to retain Meade instead of Harris in his affidavit:

> 25.   Harvey Galloway assigned me to work on the South Carolina hospital EDT product as Sales Manager. With HIPAA scheduled to go into effect in October 2003, a hospital provider could use any vendor. I immediately shifted much of my focus to that program for retaining the South Carolina hospital market. We pursued

12

acquisitions, and started a rapid development of a HIPAA-compliant revenue cycle management hospital replacement product. Our financial model for budget purposes showed a 50% loss of hospital market shares. I knew we needed to hit the hospital market strong with every asset at our disposal. We needed a sales person who would be extremely effective in direct marketing to South Carolina hospitals. It was perfectly clear to me that Jacki Meade was the ideal choice for that challenge. Jacki had years of experience and success selling to South Carolina hospitals, which is a competitive market. Jacki is a long-time member of and very involved with the South Carolina Hospital Association and the HFMA. She is extremely outgoing and competent, and she has extensive contacts within the hospital network.

26. In September 2002, Harvey instructed me to propose budget cuts in CD sales and marketing. The plan was to keep one sales person as the point of contact to our existing CD provider customers only, and who could also direct sell our hospital EDI products. During this same time, other members of CTC management were developing plans to reduce CD staff on the technical and support side. Harvey's instructions were to make recommendations in the best interests of CTC.

27. I told the CD sales and marketing employees that budget cuts were in the works due to problems with the CD product and that jobs would be eliminated. Betty Comer made the decision to retire at the end of the year. I notified John Evans in October that his position was being eliminated. I recommended placing April Tucker in a position where she spent half her time in the CD cost center and half her time with a non-sales unit. I recommended eliminating the positions held by Frank Baths and Laura Ross. I recommended retaining Jacki Meade to maintain the existing CD accounts and to aggressively market our EDT products to South Carolina hospitals.

28. It was obvious to me that we needed to retain Jacki. I did not consider Laura Ross, Frank Harris, or John Evans to be qualified or well-suited for marketing South Carolina hospitals or for maintaining our existing CD accounts. Laura Ross's specialty was the payer market. Frank Harris's role was in a more technical and background capacity with payers and other channel partners. We had decided, as a result of the setbacks with CD, that we would not develop payer and channel partner relationships. Frank, Jacki, and Laura had different strengths and responsibilities, and different job classifications. Comparing them would be like comparing an apple, an orange, and a banana. I was following instructions in determining which, if any, of our sales and marketing people would be best suited for the functions that would continue. Jacki was the obvious choice. Jacki was primarily responsible for outside sales and marketing to end user customers and had sold the major revenue-producing CD accounts that we would maintain. Retaining Jacki provided continuity for those major existing customers, Further, Jacki's extensive experience marketing to the hospital industry, and her South Carolina hospital contacts, made her particularly

> well-suited for our plans to target the South Carolina hospital market with our hospital EDI products. Frank Harris was not known by our existing CD users and had no South Carolina hospital contacts. In my view and experience in having known and supervised Frank, Frank lacked the necessary contacts and level of experience needed to sell to the hospital industry. My recommendations to retain Jacki and eliminate other positions had nothing whatsoever to do with race or gender.
>
> 29.    I explained the rationale for my recommendations to Harvey Galloway. I recall raising with Harvey that because Frank is black, over 40, and was a long time BCBSSC employee, HR might tell us we had to terminate Jacki as well, or keep Frank. My recollection is HR told us tenure was not an overriding factor in our situation and agreed we had very good reasons for retaining Jacki. Barbara Kelly, Vice President of HR, finalized the written notifications to be given to Frank Harris and Laura Ross, and I notified them on or about December 4, 2002 that their positions were being eliminated effective January 31, 2003.

(Hartis Aff. ¶¶ 25-29).

In summary, Hartis' recommendation in favor of retaining Meade was based primarily on her past contacts with South Carolina hospitals which would become the focus of her new sales efforts. She was also to service a few remaining CD accounts. Harris argues that this reason is unworthy of belief for several reasons. (Pl. Mem. pp. 24-32).

Harris' primary argument actually supports Hartis' reasoning. Harris argues that there were few CD accounts and those were dealt with by Hartis (Pl. Mem., p. 25).[5] Hartis' rationale was not that Meade would be the most qualified to service the CD accounts, but that she was the most qualified to sell in the South Carolina hospital market due to her previous experience and her active membership in several hospital related associations. Harris also attacks this reason. He relies on his affidavit and the affidavit of another former employee, Joyce McLean. Harris asserts that "prior

---

[5] Harris at this point also argues that Meade actually replaced him because she assumed a job title similar to his, and Meade's new position was not posted so he could apply. However, a close review of the record cited by Harris shows that Meade's title was not changed for a year after Harris was terminated (See Kelly Aff. ¶ 6). Further, there was no CD or CTC requirement that the position be posted. (Id.).

14

contacts with hospitals would not have likely given Meade any advantage over any other competent BCBSSC or CTC employee" because "BCBSSC commands a large part of the market in South Carolina and, therefore, any employee presenting BCBSSC products and services would be virtually assumed access to any hospital." (Pl. Mem., 26).

Harris is correct in that historically BCBS and CTC commanded a lion's share of the South Carolina hospital market. However, this argument loses its force when the reality of the sales market confronting CTC at the time of the decision to terminate Harris is considered. According to Hartis, with the arrival of HIPPA in October of 2003, he "needed someone with the contacts and skills to have direct contacts with South Carolina hospitals, not someone who could ride on his affiliations with CTC or BCBSSC. Also with EEDI, we were selling brand new HIPPA transactions and selling CTC, not BCBSSC. With the advent of HIPPA, any vendor could sell BCBSSC products and services." (Hartis Reply. Aff., ¶ 20). Harris' argument looks to the past and not to future sales with which Hartis was concerned.

Harris next argues that defendants' proffered reason for terminating Harris instead of Meade should not be believed because defendants failed to follow their published RIF policy. The policy is a part of the record (Hartis Dep., Ex. 7(10)). It states in relevant part:

> The Vice President for Human Resources shall handle on a case-by-case basis all matters pertaining to reductions-in-force, including the methodology by which affected persons will be selected, the amount and method of assistance provided to displaced persons in placement inside or outside the company, and other issues that may arise in connection with reductions[-]in[-]force.

Harris argues that defendant violated their procedure because there are "no records reflecting the methodology or criteria of selection as required by BCBSSC" (Pl. Mem., pp. 27-28). However, the policy does not require a written rationale.

15

Kelly was the Vice President of Human Affairs responsible in this RIF. She states that "(t)here is no requirement that I document the reasons for any reduction-in-force or that anyone document the reasons for any reduction-in-force." (Kelly Aff., ¶ 2). She also states that she approved the RIF in consultation with Galloway. (Id. ¶¶ 3-5). Harris has not shown a violation of the policy quoted above.

Harris has not shown that the reasons articulated by defendants were a pretext for discrimination.

### 4. Prima Facie Case - Failure to Hire

Harris alleges that defendants discriminated against him because of his race and gender when they failed to hire him for the position of Customer Advocate Manager–the position filled by a white female–Hardy. He does not suggest direct evidence supports this claim. Thus, a McDonnell Douglas burden shifting scheme, as discussed above, is applicable to this claim.

To establish a prima facie case of discrimination on an allegation of failure to hire (or promote), Harris must establish that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position in favor of someone not a member of a protected group under circumstances giving rise to an inference of unlawful discrimination. Alvarado v. Board of Trustees of Montgomery Cmty. Coll., 928 F.2d 118, 121 (4th Cir. 1991); Williams v. Giant Food, Inc., 370 F.3d 423, 430 (4th Cir. 2004); and Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1431 (2006).

When the Customer Advocate Manager position became vacant in December of 2002, Huddle, CTC's Vice President of Operations, was responsible for selecting the replacement. (Huddle

Dep. 10). She asked the HR office to post the position (Id. at 15). Barbara Epink was the recruiter responsible for gathering the applications and sending those of the minimally qualified applicants to Huddle. In January of 2003, Huddle received the applications of Harris and three others. Huddle devised a two-part process using point systems to select the person most qualified to fill the position. Each part comprised 50% of the process. First, Huddle graded the applications and resumes using nine relevant criteria. Second, Huddle interviewed each candidate using six questions and a factual scenario. (Huddle Dep. 20-23 and Ex. 1). Huddle selected Hardy for the position after this process was completed because she received the highest score of the applicants.[6]

Defendants argue that Harris cannot establish a prima facie case of discrimination because his rejection was not under circumstances giving rise to an inference of discrimination (Def. Mem., 19). Harris cites two circumstances which he believes create an inference of discrimination. First, Harris argues that Hardy was pre-selected for the position by Galloway. Second, Harris argues that Hardy did not meet an "essential requirement of the job." (Pl. Mem., pp. 32-33). The undersigned concludes that Harris has established a prima facie case. He was found minimally qualified for the position through the screening process. The hiring of a white female satisfies the last element of the prima facie case. Juarez v. ACS Gov't. Solutions Group, Inc., supra.

     5.    Pretext - Failure to Hire

The undersigned considers the parties' arguments in the pretext stage of the analysis. The only evidence of pre-selection is contained in Paragraph 38 of Harris' affidavit. He states that after he submitted his application, he had a meeting with Galloway who told him that he (Galloway) "already had a person in mind for the position." Harris assumes the pre-selected

---

[6] Huddle's notes and grading of the applicants are contained in Exhibit 1 to her deposition.

17

candidate was Hardy. However, the record makes it clear that Huddle was the person responsible for the decision. There is no indication that Galloway contacted Huddle about the position. Huddle testified that she had an open mind throughout the process and had no preconceived notion as to who was to be selected. (Huddle Dep. 24).[7] In any event pre-selection, in and of itself, does not amount to proof of discrimination. <u>Mackey v. Shalala</u>, 360 F.3d 463, 468-69 (4th Cir. 2004) and <u>Blue v. United States Dep't of the Army</u>, 914 F.2d 525, 541 (4th Cir. 1990). Harris also argues that discrimination is suggested by pre-selection because the posting for the position indicates that under defendants' affirmative action policies "the position was underutilized for minorities." However, the posting shows that the position was underutilized both for minorities and women. (Huddle Dep. Ex. 1).

Second, Harris argues an inference of discrimination because "Hardy never took and passed the Asset Test which was an essential requirement of the job." However, the job description does not list taking and passing the Asset Test as a requirement for the job. Kelly avers that the test was not a requirement for the position and at the time the position was filled, Harris had not taken or passed the test (Kelly Aff., ¶ 7).

Harris has failed to show that defendants' reasons for hiring Hardy instead of Harris are pretextual.

---

[7] In this argument, Harris reiterates what he claims is an inference that Galloway is biased against African-Americans. (Pl. Mem. 5-6 and 32). This inference is based on the facts that Harris was terminated due to the RIF and Davis, the HR generalist, was transferred after Galloway became CTC's Executive Vice President in 2002. Harris also relies on the lack of African-American employees hired or managed by Galloway during his career. There is no statistical analysis in the record to support a conclusion based on Galloway's career. The undersigned finds that there is no reasonable inference that Galloway is biased against African-Americans based on this record. Harris must prove a motive to discriminate by Galloway or other decisionmakers with respect to employment decisions which adversely affected him.

B.      Violation of Public Policy

Harris asserts that defendants' failure to retain him violates "the public policy of the State of South Carolina which clearly prohibits such unfair and malicious conduct." (Amended Complant, ¶ 38). In answering defendants' interrogatories number 15, Harris cites <u>Ludwick v. This Minute of Carolina, Inc.</u>, 337 S.E.2d 213 (S.C. 1985) as the basis of this claim.[8]

In <u>Ludwick</u>, the South Carolina Supreme Court established an exception to South Carolina's common law at-will employment doctrine. It held that "(w)here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." <u>Id</u>. at 216. <u>Ludwick</u> involved an at-will employee who was discharged because she chose to honor a subpoena against her employer's wishes and testify before the South Carolina Employment Security Commission. The <u>Ludwick</u> exception is limited and "applies in cases when an employer requires an employee to violate the law or the reason for the employees termination was itself a violation of the criminal law." <u>Lawson v. South Carolina Dep't. of Corr.</u>, 532 S.E.2d 259, 260-61 (S.C. 2000). With respect to the second part of the exception, S.C. Code Ann. § 16-17-560 provides that "(i)t is unlawful for a person to...discharge a citizen from employment...because of political opinions of the exercise of political rights and privileges guaranteed to every citizen by the Constitution and laws of the United States or by the Constitution and laws of this State."[9] This statute "makes it a 'crime against public policy' to fire any person in

---

[8] Harris also stated that an unidentified South Carolina Supreme Court case recently "stated that it was a violation of public policy to terminate an employee because of race." Apparently, he is referring to <u>Hessenthaler v. Tri-County Sister Help, Inc.</u>, 2003 WL 21057174 (S.C. 2003). However, that opinion was withdrawn and a new opinion substituted which removed the dicta upon which Harris relies. See <u>Hessenthaler v. Tri-County Sister Help, Inc.</u>, 616 S.E.2d 694 (S.C. 2005).

[9] This criminal offense is a misdemeanor with a maximum fine of $1,000 and/or imprisonment for two years.

19

this State because of their political beliefs." Culler v. Blue Ridge Elec. Co-op., Inc., 422 S.E.2d 91, 92 (S.C. 1992) (plaintiff discharged due to refusal to contribute to a political action committee has a wrongful discharge claim under Ludwick and S.C. Code Ann. § 16-17-560).

Harris does not suggest that he was terminated because he refused to violate a law or for his political beliefs. Defendants are entitled to summary judgment on this claim.

## Conclusion

Based on a review of the record, it is recommended that defendants' motion for summary judgment be granted.

                                                Respectfully submitted,

                                                s/Joseph R. McCrorey
                                                United States Magistrate Judge

August 10, 2006
Columbia, South Carolina